William H. WHITE et al., Plaintiffs,

v.

Lieutenant General William A. KNOWL-TON, Superintendent, United States Military Academy; and Brigadier General Philip R. Feir, Commandant of Cadets, United States Military Academy, Defendants.

No. 73 Civ. 2351.

United States District Court,
S. D. New York.

June 14, 1973.

Wood & Floge, Joseph M. Grines, Langhorne, Pa., for plaintiffs; Patrick T. Burke, New York City, of counsel.

Paul J. Curran, U. S. Atty., S. D. N. Y., for defendants; William Bronner, New York City, of counsel.

## OPINION DISMISSING ACTION

WHITMAN KNAPP, District Judge.

Six United States Military Academy cadets who for all intents and purposes have been separated from the Academy [1] for violation of the Cadet Honor Code [2] bring this action for preliminary and permanent injunctive relief against the Superintendent of the Academy and the Commandant of Cadets. They seek a judgment declaring unconstitutional the procedures which have resulted in their imminent separation and an order directing that they not be separated unless and until they are found by constitutionally adequate procedures to deserve such separation. This court's jurisdiction is conceded. At oral argument of plaintiffs' motion for a preliminary injunction held on June 7, 1973 the parties agreed pursuant to Fed.R.Civ.P. 65(a)(2) to consolidate the hearing on that motion with trial on the merits. As both sides have chosen to rely on affidavits and other documents rather than to call witnesses, the posture of the action is in effect that of one where both parties seek summary judgment. For the reasons that follow, I find that no relief is warranted and dismiss the complaint.

In view of the fact that events at West Point have in recent days generated a fair amount of publicity and litigation only tangentially related to the case at bar, it is helpful to isolate the precise issues before me and to emphasize what is not now before me. I begin with a narrative of the facts leading up to this lawsuit.

On April 5 and 6, 1973 the Physics Department at West Point held examinations in four courses. The students in each course were divided into sections, to which examinations were given at different times. Identical short-answer questions were used for each section but

---

1. Subsequent to the filing of this action plaintiff Bunzmann tendered his resignation to the Academy. As this significantly distinguishes him from his fellow plaintiffs, all further references to "plaintiffs" will exclude him unless otherwise indicated.

2. The Cadet Honor Code consists of a single maxim: "A cadet will not lie, cheat or steal nor tolerate those who do."

the order in which the questions appeared was scrambled for the test given at a later hour. Each of the plaintiffs took his test at one of the later hours, and turned in a paper showing so high a correlation to the correct answers for the earlier examination as strongly to suggest advance knowledge of the correct answers to the earlier examination. The matter was accordingly referred to the Cadet Honor Committee, which is the cadets' self-policing body to be described fully later on.

Between April 15 and April 30, 1973 each of the plaintiffs was contacted by an Honor Committee representative and told to appear before the Committee for a hearing on the possible Honor Code violation. The hearings were held, and each plaintiff was found to have cheated on the physics examination.

■ As a consequence of the Honor Committee's adverse finding, plaintiffs were to some degree isolated from their classmates and placed under a fair amount of restrictions pending the convening of board of officers to conduct de novo hearings as to whether or not they had cheated. Those hearings were held and, in every case, the board of officers found that the cadets had cheated. All plaintiffs with the exception of Harold Bunzmann, who has now resigned from the Academy, face formal separation from West Point. Their only chances of forestalling that concededly drastic result lie in the almost negligible possibility that the Secretary of the Army will decide to waive his own regulation requiring automatic expulsion[3], or in a finding by this Court that the process just summarized violated the United States Constitution.

Article 16 of the *Regulations for the United States Military Academy*, promulgated by the Secretary of the Army, governs separations of cadets. Section 16.04, dealing specifically with separations for Honor Code violations, provides:

a) A cadet who violates the Cadet Honor Code will be separated from the Academy. A cadet who is alleged to have violated the Honor Code may, at the discretion of the Superintendent, be allowed to resign, be tried by court-martial, or be brought before a board of senior officers convened by the Superintendent to investigate the matter and to make findings. In the event of trial, the action taken will be in accordance with the provisions of the Uniform Code of Military Justice, and applicable regulations.

b) If the cadet appears before a board of officers, the board will make findings with respect to all alleged violations of the Cadet Honor Code by the cadet concerned, and will submit a report of its proceedings and findings to the Superintendent. A copy of the report will be furnished to the respondent, who may submit a written statement to the Superintendent.

c) The Superintendent may seek the advice of any member of his staff or the Academic Board. He will review the report of proceedings; give full consideration to any statement submitted by the respondent; and approve or disapprove, in whole or in part, the findings of the board of officers. If he approves a finding of a violation of the Cadet Honor Code, he will submit his recommendation and all pertinent documents to Headquarters, Department of the Army, for final action. In such cases, and in cases of cadets who are allowed to resign, the Superintendent will also recommend either discharge from the service or transfer to an appropriate status in a Regular or Reserve component.

3. In view of the ephemeral possibility of success in any administrative proceedings still open to plaintiffs, I am rejecting the defendants' technically valid claim that plaintiffs have not established the exhaustion of remedies.

If discharge is recommended, the type discharge will be specified.

Nothing in this section indicates that the student Honor Committee must play an essential part—or any part whatever—in the process of separation for Honor Code violations. However, it appears from affidavits and from a Memorandum issued by Lieut. Col. Henry S. Larsen (defendants' Exhibit A) that the Academy has developed the practice of referring all apparent violations of the Honor Code to the Honor Committee for initial action; and that, in normal course, clearance by the Committee will put the matter at rest. Paragraph 2(c) of Lieut. Col. Larsen's Memorandum provides that:

> An apparent violation of the Cadet Honor Code discovered by an officer will be reported to the Head of the Department or Activity, who will in turn refer the matter to the Deputy Commandant of Cadets who will refer it to the Chairman, Cadet Honor Committee.

Army Regulation No. 15–6, *Procedure For Investigating Officers and Boards of Officers Conducting Investigations*, sets forth comprehensive rules governing boards of officers such as those convened to hear the instant plaintiffs' cases. The regulation in general contemplates full trial-type hearings; it provides generously for the rights of persons under investigation, establishes that "substantial evidence" be the appropriate evidentiary standard; and it mandates the statement of clear findings. As shall later appear, plaintiffs have only minor quarrel with the procedures followed by the boards of officers.

Finally, we come to the Corps of Cadets publications concerning its Honor Code and Honor Committee, excerpts from which have been submitted by plaintiffs. The Honor Committee is described in these excerpts as having responsibility for investigating allegations of honor violations. It is also stated that any finding of "guilt" must be unanimous and based on belief beyond a reasonable doubt, not only that the offender wilfully violated the Code but also that he was aware of the penalty for his conduct; and that, following an adverse finding, the offender is to be interviewed to discuss the options of resigning or requesting the convening of a board of officers.

Plaintiffs' attack upon these proceedings is comprehensive. Their allegations are in substance as follows:

1. The Cadet Honor Code is unconstitutionally vague in its use of the terms "lie, steal or cheat";

2. The exclusive mandatory penalty of separation for an Honor Code violation is so arbitrary as to amount to a denial of due process;

3. Plaintiffs were denied procedural due process before the Honor Committee, basically in that

 a) they were given inadequate notice of Committee proceedings and of the specific charges and evidence against them;

 b) they were not provided with the assistance of counsel while preparing for their appearances before the Committee;

 c) they were not advised of their right to remain silent;

 d) they had no opportunity to confront or to cross-examine adverse witnesses nor to present witnesses in their own behalf;

 e) they were not given reasons for the Committee's decisions nor afforded the opportunity to find out what had transpired during its closed sessions.

4. Official pressure was applied to plaintiffs to make them resign rather than seek board of officers hearings; and

5. Plaintiffs were denied due process before the board of officers, basically in that

 a) each board included graduates of military academies and was thus biased against the plaintiffs;

b) the boards did not apply the "beyond a reasonable doubt" standard of proof;

c) the boards did not require unanimous decisions.

I will take each point in order.

## 1. *Vagueness.*

■ The Cadet Honor Code consists of a single commandment: "A cadet will not lie, cheat or steal nor tolerate those who do." All plaintiffs were accused of cheating. The meaning of that word and the nature of the conduct described by it—and certainly no gray areas were involved in the present case—are so perfectly plain to anyone and so obviously matters of emphasis at the Academy that I find this allegation to be frivolous.

## 2. *The Exclusive Mandatory Penalty.*

■ The fact that a cadet will be separated from the Academy upon a finding that he has violated the Honor Code is known to all cadets even prior to the beginning of their careers there. The finding of a code violation by hypothesis includes a finding of scienter on the part of the offender. While separation is admittedly a drastic and tragic consequence of a cadet's transgression, it is not an unconstitutionally arbitrary one, but rather a reasonable albeit severe method of preventing men who have suffered ethical lapses from becoming career officers. That a policy of admonitions or lesser penalties for single violations might be more compassionate—or even more effective in achieving the intended result—is quite immaterial to the question of whether the harsher penalty violates due process.

## 3. *Claimed Procedural due process violations at the Honor Committee stage.*

■ The basic difficulty with plaintiffs' reliance upon supposed due process violations by the Honor Committee is that it has not been shown that any action by the Committee played a necessary part in any determination by a board of officers, or will play a necessary part in any official act separating plaintiffs from the service or leading to such separation. Plaintiffs describe all manner of serious consequences that may result—some of which in this case actually have resulted—from actions of the Honor Committee. In this case, for example, plaintiffs were placed in the Boarders' Ward in consequence of Committee action. In other cases, cadets have been "silenced" by the Corps as a result of Committee findings which had been specifically repudiated by a board of officers. I mention these possible results of Honor Committee action simply to note that—regardless of whether they can be justified—they present no question in this proceeding.[4] Nothing that happened to these plaintiffs in the Boarders' Ward—or to other cadets who had been silenced—has the slightest bearing upon the question of whether these plaintiffs should be permitted to pursue their military careers, or has been shown to have had any effect on the manner in which the several boards of officers conducted the cases before them.

■ If we were to adopt plaintiffs' suggestion that Academy tradition has established the Committee as an integral part in the procedure for separating a cadet, it would be necessary—in order to evaluate plaintiffs' due process claims— to examine the role *in the separation*

---

4. *It should be noted, with respect to the* "Boarders' Ward" allegation, that the defendants vigorously assert that plaintiffs' temporary separation from cadet routine and placement in the Boarders' Ward was in no sense punitive but constituted a measure necessary to enable them to prepare for their trials. With respect to "silencing", such punishment could not in the nature of things be inflicted upon these plaintiffs; it is used only against cadets who—unlike these plaintiffs—have been exonerated by a board of officers.

*process* which tradition has assigned to the Committee. The closest analogy that comes to mind is to a grand jury in the criminal process. Such analysis provides another reason for rejecting plaintiffs' contention in this regard. Except for the right to "remain silent", none of the rights of which plaintiffs claim to have been deprived before the Committee are available to a defendant subject to grand jury investigation. As to the right of silence, there is no suggestion that anything said by any plaintiff before the Honor Committee was used or referred to in any board of officers hearing. It follows that even if it were assumed that the Honor Committee hearings had become integral parts of the proceedings which brought plaintiffs before the boards of officers, none of plaintiffs' claims concerning the due process short comings of the Committee could form a basis for present relief.[5]

### 4. *Pressure to resign.*

■ Plaintiffs allege that following the Honor Committee's decisions they were urged to resign from the Academy rather than seek hearings before boards of officers. Apparently it is plaintiffs' contention that such pressure rendered illusory the possibility of any meaningful vindication once the Honor Committee had found an Honor violation, and therefore that due process had to precede such finding. Granting the legal merit of this position, plaintiffs have offered no persuasive evidence to support it. Their affidavits indicate no more than that their Academy superiors advised them of the hard facts of life— that should a cadet ultimately be found by a board of officers to have cheated and then be separated, the reflection of separation in the cadet's records would probably carry more stigma than that attached to a discreet resignation. This is a matter of common sense pondered

by anyone faced with the choice of resignation or possible dismissal from any organization, civil or military. No evidence has been submitted to suggest that the discussions about these options did anything more than provide plaintiffs with information upon which to base an intelligent exercise of the choices before them.

### 5. *Claimed deficiencies in board of officers' hearings.*

■ Plaintiffs' final allegations attempt to establish that even if the boards of officers' hearings were not tainted— or as a practical matter precluded by the Honor Committee proceedings—they were themselves unfair in three respects. First, it is contended that participation by officers who have graduated from the Academy led to fatal bias against alleged honor violators such as the plaintiffs. This contention is, in my view, frivolous.

■ Second, plaintiffs contend that their violations should have been proven beyond a reasonable doubt rather than merely by substantial evidence. Apparently this contention rests on plaintiffs' interpretation of Army Regulation 15–6 governing boards of officers (*supra* p. 6). Section I. 1. provides that

> Generally, this regulation is supplemental to [such] specific regulations . . . . In case of conflict between this regulation and a pertinent specific regulation, however, the latter will govern.

Section III. 20. provides that the findings of boards of officers "must be supported by substantial evidence, which is defined as such evidence as a reasonable mind can accept as adequate to support a conclusion."

Plaintiffs' theory is that the cadet Honor Committee's policy of finding honor violations only if scienter is estab-

---

5. It is significant that the plaintiffs raise none of the kind of constitutional claims which could upset a criminal conviction because of grand jury shortcomings. For example, plaintiffs do not contend that the Committee was improperly constituted or prejudiced, or that its action could have been affected by unconstitutionally seized evidence.

lished beyond a reasonable doubt, is a pertinent and more specific regulation thus intended by Army Regulation 15–6. I. 1. to supercede III. 20. I disagree. There is no basis upon which it could be found that the Honor Committee statement of policy is either a "regulation" or otherwise binding on boards of officers.

 Furthermore, since board of officers proceedings are not criminal, the criminal standard of proof need not be applied, nor is any constitutional question presented by the boards' ability to act other than unanimously.

For the foregoing reasons, the complaint is dismissed.

So ordered.